UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

GREAT AMERICAN ALLIANCE
INSURANCE COMPANY, a foreign
corporation,

       Plaintiff,

    v.                  Case No. 5:24-cv-00055

AUTO-OWNERS INSURANCE
COMPANY, a foreign corporation,

       Defendant.

_____/

**COMPLAINT WITH DEMAND FOR JURY TRIAL**

Plaintiff, Great American Alliance Insurance Company ("Great American"), by its attorneys, Edward T. Sylvester and Sylvester Law Center, PLLC, as and for its Complaint with Demand for Jury Trial against the defendant, Auto-Owners Insurance Company ("Auto-Owners"), alleges, upon information and belief, as follows:

**PARTIES**

1.    Plaintiff Great American is an insurance company organized and existing under the laws of the State of Ohio, with its principal place of business in Ohio located at 301 E. Fourth Street, Cincinnati, Ohio 45202.

2.      Upon information and belief, and at all times relevant, defendant Auto-Owners was and still is a corporation organized and existing under the laws of the State of Michigan with its principal place of business in Michigan located at 6101 Anacapri Boulevard, Lansing, Michigan 48917.

## JURISDICTION

3.      Great American is, and was at all times material to this action, domiciled in the State of Ohio with its principal place of business in the State of Ohio.

4.      Auto-Owners is, and was at all times material to this action, domiciled in the State of Michigan with its principal place of business in the State of Michigan.

5.      Complete diversity of citizenship exists in this matter.

6.      The amount in controversy exceeds $75,000.00, exclusive of costs, interest and attorneys' fees.

7.      Accordingly, this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1332.

8.      Venue is proper in the Middle District of Florida, Ocala Division, pursuant to 28 U.S.C. § 1391(b), because the relief sought herein arises out of the settlements of the following two lawsuits against Summit Greens Residents' Association, Inc. ("Summit Greens") and Leland Management, Inc. ("Leland"):

        a.     *Karin Fisher, ind. and as P.R. of the Est. of Delmar Fischer v. Summit Greens Residents' Association, Inc., et al.*, Case No.: 35-2018-CA-001520 ("Fischer Action").

        b.     *Charlie Lewis and Dessie Larita Brown-Lewis v. Summit Greens Residents' Association, Inc., Leland Management, Inc., and Roberts Pool Service and Repair, Inc.*, Circuit Civil Case No. 2021-CA-000858 ("Lewis Action").

9.     Venue is also proper in the Middle District of Florida, Ocala Division, pursuant to 28 U.S.C. § 1391(b), because Auto-Owners' primary policy and Great American's excess policy were, respectively, issued and delivered to Summit Greens in Lake County, Florida, and both Summit Greens and Leland qualified as insureds under the respective policies of insurance for purposes of the Fisher Action and Lewis Action.

**PRELIMINARY STATEMENT**

10.    This action is brought for the purpose of holding Auto-Owners accountable to Great American for Auto-Owners' unilateral withholding of notice to Great American of the claim by Charlie Lewis ("Lewis Claim") against Summit Greens and Leland—for more than two years before the Lewis Action was served on Summit Greens and Leland and for nearly two years before the Fisher Action was settled—despite the fact that the Fisher Action and the Lewis

Claim arose from the same, single occurrence and despite the potential for high exposure to Summit Greens, Leland and Great American for the Fischer Action and Lewis Claim.

11.     Auto-Owners was the primary carrier for Summit Greens and Leland as it respected the Fisher Action, the Lewis Claim and the Lewis Action.

12.     Under Florida law, a primary carrier is obligated as follows:

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. **This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.** Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith. The question of failure to act in good faith with due regard for the interests of the insured is for the jury.

*Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980) (citations omitted and emphasis added).

13.     Likewise, Florida law is clear that primary carriers are "obligated to conduct the defense in good faith **and at a minimum give notice to the excess carrier of the critical aspects of the case as it progressed**." *U.S. Fire Ins. v.*

4

*Morrison Assur*, 600 So. 2d 1147, 1151 (Fla. Dist. Ct. App. 1992) (citations omitted

and emphasis added) (recognizing "the position of the [excess carrier] is

analogous to that of the insured . . .." *Id.* (insertion added)). "In other words, the

excess insurer 'stands in the shoes of the insured,' to whom the primary insurer

directly owes a duty to act in good faith." *Perera v. U.S. Fidelity and Guaranty Co.*,

35 So. 3d 893, 900-01 (Fla. 2010) (citations omitted).

14.    Florida law requires a primary carrier to satisfy the following

requirements—for the equal protection of the primary carriers' insureds and for

any excess carriers—when multiple claimants are at issue:

> Florida law provides that where multiple claims arise out of one accident
> the liability insurer may exercise its discretion in how it elects to settle
> claims, "and may even choose to settle certain claims to the exclusion of
> others, provided [that] this decision is reasonable and in keeping with its
> good faith duty. In order to satisfy these requirements the insurer must:
> **(1) fully investigate all claims arising from a multiple claim accident; (2)
> seek to settle as many claims as possible within the policy limit; (3)
> minimize the magnitude of possible excess judgments against the
> insured by reasoned claim settlement; and (4) keep the insured
> informed of the claim resolution process**.

*General Security National Insurance Company v. Marsh*, 303 F. Supp. 2d 1321, 6-7

(M.D. Fla. 2004) (emphasis added).

15.    Under Florida law, "where multiple claims arise out of one accident,

the liability insurer has the right to enter reasonable settlements with some of

those claimants, regardless of whether the settlements deplete or even exhaust

the policy limits to the extent that one or more claimants are left without recourse

against the insurance company." *Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So.2d 555, 560 (Fla. 4th DCA 2003) (quotation omitted). Additionally, when there are multiple claimants, "it follows that, insofar as the insureds' interest governs, the fund should not be exhausted without an attempt to settle as many claims as possible." *Id.* at 481. Under Florida law, a primary carrier is precluded from "indiscriminately settles with one or more of the parties for the full policy limits" *Shuster v. South Broward Hosp. Dist.*, 591 So. 2d 174, 177 (Fla. 1992).

16.     Florida courts also evaluate whether the excess insurer "paid money that it should not have been required to pay, absent the primary insurer's bad faith." *Vigilant Ins. Co. v. Cont'l Cas. Co.*, 33 So.3d 734, 738 (Fla. 4th DCA 2010) ("[T]he insured, or the excess insurer standing in the shoes of the insured, is damaged because it has paid the judgment.").

17.     "Under the doctrine of equitable subrogation, an excess insurer has the right to 'maintain a cause of action . . . for damages resulting from the primary carrier's bad faith refusal to settle the claim against their common insured.'" *Perera v. U.S. Fidelity and Guaranty Co.*, 35 So. 3d 893, 900-01 (Fla. 2010) (citations omitted).

**GENERAL ALLEGATIONS**

*The Fisher Action and The Lewis Action*

6

18.     In 2018, Karin Fisher, individually and as personal representative of the Estate of Delmar Fischer, filed suit, in pertinent part, against Summit Greens Residents' Association, Inc. ("Summit Greens") and Leland Management, Inc. ("Leland") in Lake County, Florida in the matter captioned, *Karin Fisher, ind. and as P.R. of the Est. of Delmar Fischer v. Summit Greens Residents' Association, Inc., et al.*, Case No.: 35-2018-CA-001520 ("Fischer Action").

19.     In 2021, Charlie Lewis and Dessie Larita Brown-Lewis filed suit, in pertinent part, against Summit Greens and Leland in the matter captioned, *Charlie Lewis and Dessie Larita Brown-Lewis v. Summit Greens Residents' Association, Inc., Leland Management, Inc., and Roberts Pool Service and Repair, Inc.*, Circuit Civil Case No. 2021-CA-000858 ("Lewis Action").

20.     The Fisher Action and the Lewis Action, while separate actions, both alleged damages arising from the same hot tub located on the Summit Greens property managed by Leland.

21.     The Fisher Action was voluntarily dismissed with prejudice on August 18, 2021, as it respected Summit Greens and Leland, and such dismissal was premised on a confidential settlement agreement. (By not attaching the confidential settlement agreement to this Complaint, of which Auto-Owners has a copy, Great American does not intend to waive its right to submit to this Court

such settlement agreement—in whole, in part, under seal, or otherwise—as needed by this Court or by Great American for its case-in-chief.)

22.    The Lewis Action was voluntarily dismissed with prejudice on August 25, 2022, as it respected Summit Greens and Leland, and such dismissal was premised on a confidential settlement agreement. (By not attaching the confidential settlement agreement to this Complaint, of which Auto-Owners has a copy, Great American does not intend to waive its right to submit to this Court such settlement agreement—in whole, in part, under seal, or otherwise—as needed by this Court or by Great American for its case-in-chief.)

*The Lewis Claim*

23.    Great American received first notice of the Lewis Action on August 19, 2021 from Auto-Owners.

24.    Included with Auto-Owners' first notice to Great American of the Lewis Action—but not attached as an exhibit to the Lewis Action—was a series of emails between Auto-Owners and non-party Assured Partners, dated from September 13, 2019 to August 13, 2021, that specifically discussed the Lewis Claim ("Lewis Claim Emails"). (By not attaching the Lewis Claim Emails to this Complaint, of which Auto-Owners has a copy, Great American does not intend to waive its right to submit to this Court such Lewis Claim Emails—in whole, in

part, under seal, or otherwise—as needed by this Court or by Great American for its case-in-chief.)

25.     Until August 19, 2021, Great American was unaware of the Lewis Claim Emails.

26.     Based on the Lewis Claim Emails, on or before September 13, 2019—and unbeknownst to Great American—Auto-Owners assigned a claim number to the claim asserted by Charlie Lewis ("Mr. Lewis") against Summit Greens and Leland.

27.     Until August 19, 2021, Great American was unaware that Auto-Owners was aware of the Lewis Claim.

28.     It was not until October 6, 2022, in correspondence from Auto-Owners' coverage counsel ("AO Letter"), that Great American learned Auto-Owners actually received first notice of the Lewis Claim on June 7, 2019—more than three months before the first of the Lewis Claim Emails and more than 26 months before Great American learned of the Lewis Claim on August 19, 2021. (By not attaching the AO Letter to this Complaint, of which Auto-Owners has a copy, Great American does not intend to waive its right to submit to this Court such AO Letter—in whole, in part, under seal, or otherwise—as needed by this Court or by Great American for its case-in-chief.)

29.     In addition to the AO Letter, the contents of the Lewis Claim Emails demonstrate that Auto-Owners was aware of the Lewis Claim before the earliest September 13, 2019 email communication, including confirmation of having received a letter of representation for Mr. Lewis with subsequent investigation by Auto-Owners. The content of the letter of representation and subsequent investigation—as of the date of this filing—remain unknown to Great American.

30.     Additionally, the Lewis Claim Emails confirm compliance with a statutory disclosure request, as well as additional investigation. The content of Auto-Owner's disclosure response and further investigation—as of the date of this filing—remain unknown to Great American.

31.     Throughout the Lewis Claim Emails, Auto-Owners provides status reports to non-party Assured Partners regarding its investigation of the Lewis Claim. The details of Auto-Owner's investigation—as of the date of this filing—remain unknown to Great American.

32.     The Lewis Claim Emails further demonstrate that despite whatever information Auto-Owners had gathered in its investigation of the Lewis Claim, Auto-Owners unilaterally decided to forego proactive strategies of resolution—and unilaterally decided to forego notification of the Lewis Claim to Great American—in favor of waiting for the statute of limitations on the Lewis Claim to expire.

33.     The Lewis Claim Emails confirm—without any supporting backup—that Auto-Owners closed the Lewis Claim due to the expiration of the statute of limitations.

34.     Subsequent to its closure of the Lewis Claim, the Lewis Claim Emails confirm that Auto-Owner was given notice by non-party Assured Partners that the Lewis Action was timely filed—before the statute of limitations had run on the Lewis Claim.

35.     There is nothing in the Lewis Claim Emails that indicate Auto-Owners gave notice of the Lewis Claim to Summit Greens, Leland or Great American before August 19, 2021.

36.     There is nothing in the Lewis Claim Emails that indicate Auto-Owners had any concern of potential exposure to Summit Greens, Leland or Great American that may result from the Lewis Claim.

37.     There is nothing in the Lewis Claim Emails that indicate Auto-Owners had any concern for the impact the Fisher Action had on the Lewis Claim.

38.     There is nothing in the Lewis Claim Emails that indicate Auto-Owners gave notice to Mr. Lewis' counsel of the mediation in the Fisher Action.

39.     Based on the Lewis Claim Emails, for more than two years before giving notice to Great American of the Lewis Claim, Auto-Owners had

knowledge of the Lewis Claim, investigated the Lewis Claim, communicated with Mr. Lewis' counsel about the Lewis Claim, had internal discussions about the Lewis Claim, evaluated the Lewis Claim, and gambled the Lewis Claim would expire by virtue of the statute of limitations—yet during this time period, Auto-Owners did not once notify Summit Greens, Leland and Great American of the Lewis Claim.

40.     By failing to provide notice of the Lewis Claim to Great American—despite having knowledge of the Lewis Claim for more than two years before the Fisher Action settled—Auto-Owners was acting solely in its own interests.

41.     By failing to provide notice of the Lewis Claim to Great American—despite having knowledge of the Lewis Claim for two years before the Fisher Action settled—Great American was inexorably prejudiced.

## EQUITABLE SUBROGATION

42.     Great American repeats, reiterates and realleges each and every allegation of the preceding paragraphs 1-41 as set forth herein, verbatim and fully at length.

43.     As the primary insurer of Summit Greens and Leland, Auto-Owners controlled the defense of Summit Greens and Leland in the Fischer Action and the Lewis Action.

44.     As the primary insurer of Summit Greens and Leland, Auto-Owners was in the best position to assess the extent of the losses and exposure facing Summit Greens, Leland and Great American in the Fischer Action and Lewis Claim.

45.     As the primary insurer of Summit Greens and Leland, Auto-Owners was in the best position predict when Great American's excess coverage was implicated in the Fischer Action and Lewis Claim.

46.     Before the Fisher Action was settled, Auto-Owners knew Great American was the excess carrier for Summit Greens and Leland.

47.     Before the Fisher Action was settled, Auto-Owners ignored requests from Great American for information and confirmation regarding other potential claimants.

48.     For two years before the Fisher Action settled, Auto-Owners unilaterally decided to forego proactive strategies of investigating and resolving the Lewis Claim.

49.     For two years before the Fisher Action settled, Auto-Owners unilaterally decided to forego notification of the Lewis Claim to Summit Greens, Leland and Great American.

50.     Auto-Owners' inaction regarding notification of the Lewis Claim to Summit Greens, Leland and Great American was improper and epitomized

Auto-Owners' self-interest over the interests of Summit Greens, Leland and Great American.

51.    As a result of Auto-Owners' self-interest and failure to give proper notice, Great American was prejudiced to the extent: (a) Great American was unable to investigate the Lewis Claim for more than two years, (b) Great American was unable to assess and evaluate the Lewis Claim for more than two years, (c) Great American was unable to resolve the Fisher Action and Lewis Claim simultaneously, globally and in accordance with Florida law regarding multiple claimants with one occurrence, (d) Great American was precluded from challenging Auto-Owners' claim handling and "statute of limitations" strategy regarding the Lewis Claim, (e) Great American was precluded from overstepping Auto-Owners in its failed claims handling of the Lewis Claim to seek settlement options commensurate with Florida law for multiple claim matters.

52.    As a result of Auto-Owners' self-interest and failure to give proper notice, Great American was prejudiced to the extent: (a) Great American paid insurance proceeds to settle the Lewis Action and protect Summit Greens and Leland, (b) Great American paid more insurance proceeds to settle the Lewis Action and protect Summit Greens and Leland than if Auto-Owners had timely given notice to Great American, (c) Great American paid attorneys' fees to

defend and advise Summit Greens regarding settlement of the Lewis Action, and (d) Great American has expended, and will continue to expend, attorneys' fees and costs to prosecute this action.

**WHEREFORE**, Great American respectfully requests that:

(a)     The Court enter judgment against Auto-Owners for equitable subrogation: (1) in an amount equal to Great American's expenditures to settle the Lewis Action, including interest, attorneys' fees and costs, (2) in an amount to be determined at trial, or (3) in an amount this Court deems just and proper; and

(b)     Great American be awarded its attorneys' fees, costs and disbursements of this action; and

(c)     Great American shall have such other, further and different relief as this Court may deem just and proper.

Dated:      February 6, 2024

By: /s/ *Edward T. Sylvester*
Edward T. Sylvester
Florida Bar No.: 51612
Primary: Edward@SylvesterLawCenter.com
Secondary: Terry@SylvesterLawCenter.com
SYLVESTER LAW CENTER, PLLC
15800 Pines Boulevard, Suite 316
Pembroke Pines, Florida 33027
Tel.: 954-777-6021
*Attorneys for Plaintiff*